IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHARLES BROWN, *et al.*,                    *

     Plaintiffs,                         *

      v.                                *

                     Civil Action No.: RDB-06-524

DAVID HOVATTER, *et al.*,                   *

     Defendants.                         *

*      *      *      *      *      *      *      *      *      *      *      *      *

## MEMORANDUM OPINION

Plaintiffs Charles Brown, Brian Chisolm, Joseph B. Jenkins, III, and Gail Manuel (collectively "Plaintiffs") bring this civil rights lawsuit pursuant to Article I, Section 8 and the Fourteenth Amendment of the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and 28 U.S.C. § 2201, seeking declaratory and injunctive relief against David Hovatter, in his official capacity as President of the Maryland State Board of Morticians, and Faye Peterson, Michael Ruck, Sr., Gladys Sewell, Donald V. Borgwardt, Marshall Jones, Jr., Michael Kruger, Brian Haight, Robert Bradshaw, Jeffery Pope, and Vernon Strayhorn, Sr., in their official capacities as members of the Maryland State Board of Morticians (collectively "Defendants").[1]  In this case, Plaintiffs challenge the constitutionality of two provisions of the Maryland Morticians Act, Md. Code Ann., Health Occ. §§ 7-101-602 (the "Act" or the "Morticians Act"), that limit ownership and operation of funeral homes in Maryland.  This Court has granted the motion of the International Cemetery, Crematory and Funeral Association ("ICCFA") to file an *amicus curiae* brief in support of the Plaintiffs' complaint.  Plaintiffs

---

[1] By order of December 8, 2006, this Court granted the motion of John Armiger to withdraw as a plaintiff in this action. (Paper No. 24.)

contend that the provisions prohibiting corporations from owning and operating funeral homes, as set forth in sections 7-309(a) and 7-309(b) of the Morticians Act, violate the Commerce Clause[2] and the Due Process and Equal Protection Clauses of the Fourteenth Amendment[3] of the United States Constitution.  In addition, Plaintiffs argue that section 7-310 of the Morticians Act violates the Due Process and Equal Protection Clauses because it permits funeral home ownership only by "licensed individuals," who are defined as licensed morticians, licensed funeral directors, or their surviving spouses and executors of their estates.

Pending before this Court are the parties' cross motions for summary judgment, which have been fully briefed by the parties.  A hearing was held on September 10, 2007, at which time counsel for all the parties agreed that there are no genuine issues of material fact and that the case is ripe for determination by this Court as a matter of law.  The respective motions for summary judgment by the parties are both GRANTED IN PART and DENIED IN PART.

For the reasons that follow, this Court holds that sections 7-309(a) and 7-309(b) of the Morticians Act, which prohibit corporate ownership of funeral homes in Maryland with indefinite exemptions for corporations holding licenses existing as of June 1, 1945, violate the dormant Commerce Clause of the United States Constitution.  Defendants and their successors are hereby enjoined from prohibiting or limiting the corporate ownership of funeral homes in Maryland.  For the reasons that follow, this Court holds that section 7-310 of the Morticians Act, which establishes a licensing scheme for the operation of funeral homes in Maryland, is rationally related to a legitimate state interest and does not violate the Due Process and Equal

---

[2] U.S. Const. art. I, § 8, cl. 3.

[3] U.S. Const. amend. XIV, § 1.

Protection Clauses of the Fourteenth Amendment.  The licensing requirement may be imposed

upon corporate and non-corporate owners of funeral homes in Maryland.  Accordingly, summary

judgment will be GRANTED for Plaintiffs with respect to their challenge to sections 7-309(a)

and 7-309(b) of the Morticians Act, and GRANTED for Defendants with respect to their defense

of section 7-310 of the Morticians Act.

## BACKGROUND

**I.    The Regulatory Scheme**

The stated purpose of the Morticians Act "is to protect the health and welfare of the

public."  Md. Code Ann., Health Occ. § 7-103.  The Morticians Act establishes a comprehensive

scheme for the regulation of the funeral home industry and is enforced by the State Board of

Morticians, of which Defendants are members.  *Id*. §§ 7-201-205.

In 1971, the Morticians Act was amended to require that a funeral home must be licensed

by the State Board of Morticians before commencing operations.  Ch. 443, 1971 Md. Laws.  In

its current form, the Morticians Act provides as follows:

> A funeral establishment shall be licensed by the [State Board of
> Morticians] before the establishment may be used for the preparation
> of the remains, viewing, and conducting of services.[4]

Md. Code Ann., Health Occ. § 7-310(a)(1).  The Morticians Act limits who may obtain a funeral

home license by requiring that every application be signed by a "licensed individual" who is also

"the owner or co-owner of the establishment to be licensed."  *Id*. § 7-310(b)(2).  There are four

---

[4] The Morticians Act uses the term "funeral establishment" to mean "any building, structure, or premises from which the business of funeral directing or embalming is conducted." Md. Code Ann., Health Occ. § 7-101(h).  The parties have referred to a "funeral establishment" by the more colloquial "funeral home," and this Court will likewise use the terms synonymously.

classes of "licensed individuals": (1) a licensed mortician, *id*. § 7-302; (2) a licensed funeral director, *id*. § 7-307;[5] (3) the surviving spouse of a deceased mortician or funeral director, *id*. § 7-308; or (4) the executor of the estate of a deceased mortician, *id*. § 7-308.1.

In order to become a licensed mortician, an applicant must obtain an associate of arts degree, complete a one- or two-year apprenticeship with a Maryland mortician, and pass both the national examination administered by the American Board of Funeral Service Education and a separate Maryland law and regulations examination. *Id.* § 7-303(b).[6] The surviving spouse license requires only that the applicant pass the Maryland law and regulations examination. *Id.* § 7-308(b). The executor license does not require passing any examination, but the license expires after six months. *Id.* § 7-308.1(f). Because the holder of a surviving spouse or executor license is not required to be qualified to practice mortuary science, the Morticians Act mandates that the holder of either license employ a supervising mortician at the funeral home. *Id.* §§ 7-308(e)(1); 7-308.1(e)(1).

The Morticians Act generally prohibits corporations from owning and operating funeral homes:

> Except as otherwise provided by law, a corporation may not operate
> a mortuary science business and the [State Board of Morticians] may

---

[5] There is very little statutory difference between a mortician and a funeral director. The Morticians Act defines a mortician as "an individual who practices mortuary science," *id.* § 7-101(o), and a funeral director as "an individual who is licensed by the Board to practice all aspects of mortuary science except for embalming." *Id.* § 7-101(g). The parties have used the term mortician to encompass both morticians and funeral directors, and this Court will use the terms synonymously to encompass both meanings.

[6] The State Board of Morticians no longer grants funeral director licenses. The funeral director licenses that currently exist were issued before May 2, 1973 and have been renewed biannually ever since. *Id.* § 7-307.

4

> not issue a license to or list any corporation as licensed to operate a
> mortuary science business.

*Id*. § 7-309(a); *see also id*. § 7-101(q)(i) (defining the phrase "[p]ractice mortuary science" as

"[t]o operate a funeral establishment").  Corporations that held a license as of June 1, 1945,

however, are exempt from the general prohibition on corporate ownership:

> The [State Board of Morticians] may renew only the license of a
> corporation that:
>
> (1)    On June 1, 1945, held a license issued by this State;
> (2)    Has been renewed continuously since that date;
> (3)    Submits an application on a form required by the [State Board
>        of Morticians]; and
> (4)    Pays a fee set by the [State Board of Morticians].[7]

*Id.* § 7-309(b).  The general corporate prohibition and the exemption apply equally to licensed

and unlicensed individuals.  In other words, although one must be a "licensed individual" to own

a funeral home in every other context, *see id*. § 7-310(b)(2), there is no corresponding provision

requiring that the owner of an exempt corporate license be a "licensed individual."  Nevertheless,

the practice of mortuary science on the premises must at all times be conducted by a licensed

mortician.  *Id.* § 7-309(d).   In sum, funeral home ownership in Maryland requires that an

individual complete the demanding mortician licensing requirements, fall into one of the

---

[7] This provision was enacted in two separate pieces of legislation.  Before 1937,
Maryland funeral homes could freely incorporate, but the Maryland General Assembly amended
the Morticians Act that year to prohibit further corporate licensing.  Ch. 306, 1937 Md. Laws.
The amendment provided that "[t]he Board shall not hereafter issue licenses to, nor register any
corporation, nor shall any corporation be permitted to conduct the business or profession of
Funeral Directing which has not already been licensed and registered."  In 1945, the Maryland
General Assembly granted additional corporate licenses to "any person who was licensed as a
funeral director and was engaged in the business of funeral directing or embalming at the time of
induction into the Armed Forces of the United States during World War II."  Ch. 741, 1945 Md.
Laws.

established status exceptions (*i.e.* surviving spouse or executor), or purchase an exempt corporate license.

In their submissions to the Court, the parties agree that there are currently 283 funeral home licenses in Maryland.  (Def. Ex. 16; Sheffield-James Aff. ¶ 3-4.)  Of those, licensed morticians or funeral directors hold 214, corporate licensees hold fifty-eight, and surviving spouses licensees hold eleven.  (*Id.*)  Publicly held corporations and national chains own thirty of the fifty-eight corporate licenses, while the remaining twenty-eight are owned by privately held Maryland corporations.  (*Id.*)  There is no sunset provision on the corporate exemption, so corporations that held licenses as of June 1, 1945 may retain their exemption indefinitely. Moreover, the corporation (along with its license) is freely transferrable regardless of whether the purchaser is a "licensed individual" under section 7-310(b)(2).

The Morticians Act's restriction on corporate ownership is unique.  The only other state that has a similar prohibition on the corporate ownership of funeral homes is New Hampshire. The New Hampshire statute makes clear that "no corporation . . . shall be issued a license as a funeral director," except for "any corporation licensed prior to January 1, 1953."  N.H. Rev. Stat. Ann. § 325:15.  Pennsylvania's statute provides that all of the corporation's "shareholders [must be] licensed funeral directors or the members of the immediate family of a licensed funeral director."  63 Pa. Stat. Ann. § 479.8.  Therefore, unlike both Maryland and New Hampshire, the Pennsylvania statute regulates only who owns the corporation, but not how many corporations can operate funeral homes.  No other state restricts corporate ownership quite like Maryland and New Hampshire.

## II.    Efforts to Amend the Morticians Act

The Morticians Act ownership provisions have survived previous judicial and legislative challenges.  In 1960, a licensed mortician named L. Scott Brooks formed a corporation and applied for a corporate license to the State Board of Funeral Directors and Embalmers, the former name of the State Board of Morticians.  Citing the statutory prohibition on corporate ownership, the Board denied his request, but Brooks nonetheless began operating his corporate funeral home.  The Board subsequently suspended his mortician's license for one year.  Brooks appealed the suspension to the Court of Appeals of Maryland in the case of *Brooks v. State Board of Funeral Directors and Embalmers*, 195 A.2d 728 (Md. 1963).  The Court of Appeals upheld the corporate prohibition, writing that:

> It may at first blush seem strange that the legislature permits some corporations to conduct the business of a funeral director, but refuses to permit others to do so.  One of the two kinds of corporations . . . is established under a grandfather clause; the other was designed to preserve the assets and going concern value of the business of men engaged in the service of the country during war.  The exceptions in favor of each of these types of corporations had the purpose of preserving existing investments or values. We are of the opinion that this purpose is sufficient to sustain their separate classification.

*Id.* at 737.  Accordingly, the Court of Appeals held that the corporate prohibition did not violate the Due Process or Equal Protection Clauses of the Fourteenth Amendment.  *Id.* at 739.  This 1963 decision by Court of Appeals did not address the corporate prohibition and its validity in light of the dormant Commerce Clause of the United States Constitution.

In 1996, the Maryland General Assembly created the Task Force to Examine the State's Cemetery and Funeral Industry to assess the regulation of the funeral industry in Maryland and other states.  The Task Force concluded, *inter alia*, that "Maryland law [should] be changed to allow the issuance of additional corporate licenses for the ownership and operation of funeral

homes." Final Report of the Task Force to Examine the State's Cemetery and Funeral Industry, at 22-23 (Dec. 1996). The Final Report set off a flurry of legislative reform proposals. Bills proposing the deregulation of entry barriers into the Maryland funeral market industry were proposed in every year from 1997 through 2005, but none of these measures ever made it out of committee for a full vote of the Maryland House of Delegates or the Maryland State Senate.[8]

The State Board of Morticians and the Maryland State Funeral Directors Association ("MSFDA") have consistently opposed legislative reform. The State Board of Morticians is comprised of eight licensed morticians and four consumer members. Md. Code Ann., Health Occ. § 7-202(a). At least two members of the current State Board of Morticians have a direct interest in maintaining the prohibition on corporate ownership.[9] Moreover, there is significant overlap between the State Board of Morticians and the MSFDA. In fact, seven of the eight licensed morticians sitting on the State Board of Morticians are members of the Maryland State Funeral Directors Association. Thus, Plaintiffs contend that "the obvious financial interest these members had in maintaining the general prohibition on corporate ownership presents a troubling gloss on the Board's consistent opposition to the legislative reform measures." Pls.' Mem. Supp. Summ. J. at 15.

Plaintiffs present this evidence as a prototypical example of "regulatory capture," a term

---

[8] In fact, thirteen separate bills were introduced. *See* Sen. 340, 420th Sess. (Md. 2005); H.B. 795, 418th Sess. (Md. 2004); H.B. 1341, 418th Sess. (Md. 2004); H.B. 956, 417th Sess. (Md. 2003); H.B. 1113, 417th Sess. (Md. 2002); H.B. 1036, 415th Sess. (Md. 2001); H.B. 1464, 415th Sess. (Md. 2001); H.B. 188, 414th Sess. (Md. 2000); H.B. 503, 414th Sess. (Md. 2000); H.B. 107, 413th Sess. (Md. 1999); H.B. 475, 413th Sess. (Md. 1999); H.B. 591, 412th Sess. (Md. 1998); H.B. 321, 412th Sess. (Md. 1997).

[9] Defendant Kruger works for a corporate-owned funeral home, and Defendant Ruck owns three corporate licenses himself. (Pl. Ex. 21, Ruck Dep. 10:9-10:10.)

coined by public choice economists to indicate when members of a regulated occupation also

dominate the regulatory and law-making process in their field.  Professor Todd Zywicki of

George Mason University School of Law, a leading scholar in law and economics, testified that

the limitations on funeral home ownership in Maryland are consistent with the principles of

regulatory capture.  He stated that in his opinion the Morticians Act appears to be:

> an effort to create governmentally imposed barriers to entry in the
> funeral home industry and thereby to transfer wealth to a discrete,
> well-organized interest group at the expense of consumers of
> funeral home services and the public at large.  The result of this
> regulation is reduced competition in the provision of funeral home
> services and higher prices and reduced choice in funeral home
> products and services for consumers.

(Pl. Ex. 7, Zywicki Decl. ¶ 9.)

## III.    The Practical Effect of the Morticians Act

At the hearing on September 10, 2007, counsel for the Defendants did not dispute

Plaintiffs' credible evidence indicating that the fifty-eight corporate licenses are quite valuable,

in large part because of the market premium that results from their insulated and protected status.

For example, the Department of Legislative Services of the Maryland General Assembly has

consistently valued each of the corporate licenses, excluding assets, at between $150,000 to

$200,000.  *See, e.g.* Fiscal Notes for H.B. 1113, 417th Sess. (Md. 2002) (concluding that

"[b]ecause entry into the corporate market is restricted and there is greater demand for corporate

licenses than there are licenses, corporate licenses are currently traded at a value between

$150,000 to $200,000 "); *see also* Fiscal Notes for H.B. 188, 414th Sess. (Md. 2000); H.B. 503,

414th Sess. (Md. 2000); Fiscal Notes for H.B. 107, 413th Sess. (Md. 1999); Fiscal Notes for

H.B. 591, 412th Sess. (Md. 1998); Fiscal Notes for H.B. 321, 412th Sess. (Md. 1997).  Plaintiffs

have also submitted the testimony of Defendant Ruck, who paid $148,000 for a licensed corporation, excluding all assets except name, and $30,500 for a second licensed corporation with no assets whatsoever.  (Pl. Ex. 21, Ruck Dep. 56.15-57.11.)  Erich March, a prominent Maryland mortician, testified that he was personally aware that a corporate license sold for $250,000 more than a decade ago and Defendant Jones acknowledged that one may sell for upwards of $300,000.[10]  (Pl. Ex. 28, March Dep. 36:13-14; Ex. 17, Jones Dep. 62:19-20.)

Data collected by the United States Census Bureau indicates that a funeral in Maryland costs approximately $800 more than the national average, a price increase that partly reflects the anti-competitive nature of the Maryland funeral home industry.  (Pl. Ex. 6, Harrington Decl. ¶¶ 20-30.)  In response to a request by Delegate Joanne C. Bensen, who at the time was anticipating a vote on proposed House Bill 795, the staffs of the Federal Trade Commission's Bureau of Competition, Bureau of Consumer Protection, Bureau of Economics and the Office of Policy Planning drafted a letter that concluded that "consumers would likely benefit from having increased competition in the market for funeral home services" and that reforming the statute would not "undermine Maryland's efforts to ensure that consumers are served by capable and professionally run funeral homes."  (Pl. Ex. 3, FTC Letter to Delegate Benson, at 3.)

The benefits of the corporate form are well known and uncontested, and apply in equal force to the Maryland funeral home industry.  These benefits include free transferability, limited liability, tax advantages, perpetual existence, and the superior ability to raise capital through

---

[10] The remainder of Plaintiffs' evidence supporting this argument is too speculative to influence a motion for summary judgment, including the testimony of Earl Canapp, the legislative chair of the MSFDA.  *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (stating that testimony in opposition to a summary judgment motion must set forth specific facts based on personal knowledge).

stock sales.  Given the advantages of incorporation, it is unremarkable that, at an absolute minimum,[11] fifty-one percent of funeral homes nationwide are registered in the corporate form. (Harrington Decl. ¶ 16.)  Despite these advantages, however, only twenty-one percent of funeral homes in Maryland are owned by corporations.  (*Id.*)

## IV.   Procedural History

Plaintiff Brown and Plaintiff Manuel are prevented from owning a funeral home because they are not "licensed individuals," and challenge the licensing requirements of section 7-310 of the Morticians Act under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  Plaintiff Chisholm and Plaintiff Jenkins, although licensed morticians, are unable to open a funeral home in the corporate form because they do not own one of the fifty-eight exempt corporate licenses.  As such, they challenge section 7-309(a) of the Morticians Act under the Due Process and Equal Protection Clauses of the Fourteenth Amendment in light of the exempt corporations under section 7-309(b).  Plaintiff Chisholm, a Florida resident, is the only Plaintiff with residency outside of Maryland.  He challenges section 7-309(a) under the dormant Commerce Clause.  On March 1, 2006, Plaintiffs filed suit against the members of the State Board of Morticians in their official capacities.

---

[11] Professor David Harrington, an economist who specializes in the funeral industry, explained that the United States Census Bureau conducts an extensive survey of the funeral industry every five years. (Harrington Decl. ¶ 16 n.1.)  The results are split into two groups: firms with paid employees and firms without paid employees.  (*Id.*)  Only the ownership status of firms with paid employees is released.  (*Id.*)  In 2002, over eighty-seven percent of firms nationwide with paid employees were corporations. (*Id.*)  Based on the assumption that *none* of the firms without paid employees was a corporation, Professor Harrington determined *at least* fifty-one percent of funeral homes nationwide were incorporated.  (*Id.*)  Fifty-one percent is therefore not a prediction but instead represents the lowest possible percentage of incorporated funeral homes.

On October 11, 2006, this Court granted Defendants' Motion to Dismiss Count Four of the Complaint, which alleged that the Morticians Act violated the Privileges and Immunities Clause of the Fourteenth Amendment by imposing arbitrary and unreasonable restrictions on the ownership of funeral homes. (Paper No. 19.)   This Court denied the remainder of Defendants' Motion to Dismiss, thereby allowing Plaintiffs to proceed with discovery with respect to the remainder of their claims.  Specifically, Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201 that section 7-310 of the Morticians Act violates the Due Process and Equal Protection Clauses because it permits funeral home ownership only by "licensed individuals." Plaintiffs also seek a declaratory judgment that the corporate prohibition of section 7-309(a) of the Morticians Act violates both the Due Process and Equal Protection Clauses of the Fourteenth Amendment and the dormant Commerce Clause.  On April 24, 2007, the parties filed cross motions for summary judgment.  On September 10, 2007, the Court conducted a hearing on both motions.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  When cross motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the nonexistence of a factual dispute."  *Shook v. United States,* 713 F.2d 662, 665 (11th Cir. 1983).  At the hearing conducted on September 10,

2007, the parties agreed that there is no dispute as to any material fact and that this Court may render judgment as a matter of law.

## DISCUSSION

I.      **Section 7-310: The Licensing Requirement**

Plaintiffs have advanced their challenge on the licensing requirement to the Morticians Act under both the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The substantive aspect of the Due Process Clause embodies a liberty interest that protects, subject to reasonable government regulation, the right to pursue a chosen occupation. *E.g. Conn. v. Gabbert*, 526 U.S. 286, 291-92 (1999); *Meyer v. Nebraska*, 262 U.S. 390, 399-400 (1923). The Equal Protection Clause likewise provides for protection against government regulations that do not treat similarly situated individuals alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985).

In addressing due process and equal protection challenges to state statutes, the United States Court of Appeals for the Fourth Circuit has explained that there is "a strong presumption of validity so long as [the state statute does] not discriminate against any protected class or burden any fundamental right." *Helton v Hunt*, 330 F.3d 242, 246 (4th Cir. 2003) (citing *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313-14 (1993)). As the Fourth Circuit noted, the Supreme Court in *Vacco v. Quill*, 521 U.S. 793, 799 (1997), held that a state statute need only bear a "rational relation to some legitimate end." Both parties agree that the issues raised by Plaintiffs with respect to the licensing requirement set forth in section 7-310 do not implicate any fundamental right or suspect classification.

In addressing a constitutional challenge to the Oklahoma Funeral Services Licensing Act

by casket sellers seeking to sell caskets in Oklahoma, the United States Court of Appeals for the Tenth Circuit in *Powers v. Harris*, 379 F.3d 1208 (10th Cir. 2004), summarized the standard for analysis.[12]  The court stated that a "state economic regulation that does not affect a fundamental right and categorizes people on the basis of a non-suspect classification" will pass "constitutional muster, both as a matter of substantive due process and equal protection, by applying rational-basis review."  *Id.* at 1215 (citing *Fitzgerald v. Racing Assoc. of Cent. Iowa*, 539 U.S. 103, 107 (2003) (equal protection); *General Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) (substantive due process)).  Accordingly, the constitutional challenge to the licensing requirement of the Morticians Act is subject only to rational basis review.  Although the interests protected by the Due Process and Equal Protection Clauses are distinct–substantive due process protects fundamental rights and liberty interests from arbitrary government action, while equal protection provides for equal treatment between individuals or groups of individuals–they are analyzed together.  *See Guardian Plans Inc. v. Teague*, 870 F.2d 123, 125 n.2 (4th Cir. 1989) ("For analytical purposes, we will treat appellants' due process and equal protection challenges as one.  We do this because, when reviewing economic regulations, the legal standard—rationally related to a legitimate state interest—is the same." (internal citation omitted)).

---

[12] In *Powers*, the Tenth Circuit affirmed a district court judgment following a bench trial that found that the state statute in question did not violate substantive due process or equal protection.  The Tenth Circuit noted the contrary opinion of the United States Court of Appeals for the Sixth Circuit in *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002), in which the court affirmed a district court judgment following a bench trial that found that the licensing requirements for retail funeral merchandise stores were not rationally related to the purpose of the statute and thus violated substantive due process and equal protection.  The rational basis test was recognized as the standard for analysis in both cases.

Rational basis review is the most deferential and least exacting standard to review

constitutional claims:

> [T]he Fourteenth Amendment permits the States a wide scope of
> discretion in enacting laws which affect some groups of citizens
> differently than others.  The constitutional safeguard is offended
> only if the classification rests on grounds wholly irrelevant to the
> achievement of the State's objective.  State legislatures are
> presumed to have acted within their constitutional power despite
> the fact that, in practice, their laws result in some inequality.

*McGowan v. Maryland*, 366 U.S. 420, 425-26 (1979).   The Morticians Act expressly states that

its purpose "is to protect the health and welfare of the public."  Md. Code Ann., Health Occ. § 7-

103.  Although there is no legislative history to elaborate on this stated purpose, there is no doubt

that the protection of the health and safety of the citizens of Maryland is a legitimate purpose.

*E.g. Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 375-76 (1997); *Hodel v.*

*Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 300 (1981).   Under rational basis

review, this Court may not inquire into the sincerity of the articulated purpose because it must be

"assume[d] that the objectives articulated by the legislature are actual purposes of the statute,

unless an examination of the circumstances forces us to conclude that they could not have been a

goal of the legislation."  *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981)

(internal quotations omitted).

Moreover, this Court must consider whether the licensing requirement of the Morticians

Act, as set forth in section 7-310, furthers any legitimate purpose, even if the legitimate purpose

is unrelated to the actual purpose behind the statute.  As an economic regulation, the Morticians

Act must be upheld "if there [are] any reasonably conceivable state of facts that could provide a

rational basis for the classification."  *Beach Communications*, 508 U.S. at 313.  The burden

under rational basis review falls squarely on Plaintiffs "to negative every conceivable basis which might support it. Moreover, . . . it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.* at 315 (internal citations omitted).

Plaintiffs contend that the licensing requirement of the Morticians Act does not meet this minimal standard because there is no justification for prohibiting non-morticians from owning funeral homes.  Plaintiffs' argument is couched almost exclusively in terms of the surviving spouse and executor licenses, which, according to Plaintiffs, demonstrate the arbitrariness of the licensing requirement.  The Morticians Act, however, requires that funeral homes owned by a surviving spouse or executer licensee employ a supervising mortician on the premises.  *See* Md. Code Ann., Health Occ. §§ 7-308(e)(1); 7-308.1(e)(1).

In a factually similar case, *Guardian Plans, Inc. v. Teague*, 870 F.2d 123, 125-26 (4th Cir. 1989), the Fourth Circuit upheld a Virginia statute that was challenged on due process and equal protection grounds by a company that sold funeral goods and services through an insurance-funded prearranged funeral program.  The basis for the lawsuit was that the plaintiffs believed that it was "ludicrous to require a salesperson, who does nothing more than make preneed arrangements, to have the same credentials as a full-fledged funeral director."  *Id.* at 126.  Noting that it has long been recognized that the state may protect the health, safety and welfare of its citizens through the regulation of the funeral profession, the Fourth Circuit found that the "Virginia General Assembly could have rationally determined that keeping the arrangement of funerals in the hands of licensed funeral professionals would benefit the public by ensuring competence in funeral arrangement."  *Id.*

16

In this case, the Maryland General Assembly could have rationally determined that the public's health, safety and welfare are furthered by requiring that a licensed mortician own the funeral home where mortuary science is practiced.  The exceptions to the licensing requirement of the Morticians Act are an insufficient basis for this Court to strike down wholesale the regulatory scheme established by section 7-310.  The surviving spouse and executor licenses provide needed protection for the financial interests of a deceased mortician's family as business affairs are handled in her or his absence.  The executor license may not be "renewed or reinstated" after six months, at which point the personal representative must "qualify and be licensed as a mortician."  These licenses do not come at the expense of public health, safety, or welfare, as the surviving spouse or executor is required to hire a supervising mortician.  *See* Md. Code Ann., Health Occ. §§ 7-308(e)(1); 7-308.1(e)(1).

 Protecting the health, safety and welfare of the public is undoubtedly a legitimate state interest, and this Court finds that the licensing scheme of section 7-310 of the Morticians Act rationally furthers that interest.  The wisdom of the Maryland General Assembly with respect to the licensing requirement and limited exceptions for a surviving  spouse and executor will not be questioned by this Court under a substantive due process or equal protection challenge as the licensing scheme is rationally related to the achievement of a legitimate state interest and objective.  *See McGowan*, 366 U.S. at 425.

## II.        Sections 7-309(a) and 7-309(b): The Corporate Prohibition

Plaintiffs have challenged the general corporate prohibition of section 7-309(a), as well as the exemptions created by section 7-309(b), under not only the Due Process and Equal Protection Clauses of the Fourteenth Amendment, but also the dormant Commerce Clause.  In

1963, the Court of Appeals of Maryland addressed due process and equal protection challenges

to the ban on corporate ownership of funeral homes in *Brooks v. State Board of Funeral*

*Directors and Embalmers*, 195 A.2d 728 (Md. 1963).  In *Brooks*, the Morticians Act was not

challenged under the dormant Commerce Clause.  Plaintiffs' constitutional challenges in this

action invite further rational basis review under the Due Process and Equal Protection Clauses,

but Maryland's unique ban on corporate ownership of funeral homes, with fifty-eight exempt

corporate licenses, compels this Court to decide the case under the dormant Commerce Clause.

>A.     **Due Process and Equal Protection Clauses of the Fourteenth Amendment**

Because neither the corporate prohibition of section 7-309(a) nor the fifty-eight corporate

exemptions under section 7-309(b) implicate a fundamental right or suspect classification,

Plaintiffs' challenge is subject to the same rational basis review discussed at length above.  In

*North Dakota State Bd. of Pharmacy v. Snyders Drug Stores, Inc.*, 414 U.S. 156, 166-67 (1973),

the Supreme Court upheld a state statute that required that licensed pharmacists own the majority

of shares in a corporation seeking to be licensed to practice pharmacy.  The Supreme Court

explained as follows:

>'A standing criticism of the use of corporations in business is that
>it causes such business to be owned by people who do not know
>anything about it . . . .  The selling of drugs and poisons calls for
>knowledge in a high degree, and Pennsylvania after enacting a
>series of other safeguards has provided that in that matter the
>divorce shall not be allowed . . . .  The Constitution does not make
>it a condition of preventive legislation that it should work a perfect
>cure. It is enough if the questioned act has a manifest tendency to
>cure or at least to make the evil less.'

*Id.* (quoting *Liggett Co. v. Baldridge*, 278 U.S. 105, 114-15 (1928) (Holmes, J., dissenting)).

The quoted passage supports the notion that ownership of corporations may be limited in highly

skilled occupations where licensing is required, such as mortuary science.  The Maryland

General Assembly certainly has a rational basis to require the presence of licensed individuals in

the ownership structure of a corporation practicing mortuary science.  For example,

Pennsylvania has enacted a statute very similar to the statute approved by the Supreme Court in

*Snyders Drug Stores, Inc*., whereby all the shareholders of a corporate funeral home must be

"licensed funeral directors or the members of the immediate family of a licensed funeral

director."  63 Pa. Stat. Ann. § 479.8.  The Morticians Act, however, only permits fifty-eight

exempt corporations to practice mortuary science, any of which may be owned entirely by

unlicensed individuals.

Nonetheless, Defendants contend that the fifty-eight exempt corporations under section

7-309(b) "preserve the reliance interests of corporations that held licenses as of June 1, 1945."

Defs.' Mem. Supp. Summ. J. at 23.  They rely principally on *Brooks*, where the Court of Appeals

of Maryland held that the original owners' reliance interests were sufficient to sustain the

corporate prohibition because the classification had the "purpose of preserving existing

investments or values."  *Brooks*, 195 A.2d at 737.  While there may have been a rational basis in

preserving economic investments in 1963, it is now questionable whether the legitimate state

interest in preserving economic investments of original owners is rationally furthered by the

current statutory scheme.[13]

---

[13] In 1963, seventy-six percent of the corporate licenses remained in the control of the
pre-1945 owners.  By 2006, over ninety-five percent of the corporate licenses had been sold at
least once.  There are only three corporate licenses still held within the same family as in 1945.
Pls.' Mem. Supp. Summ. J. at 8.  Thus, there appears to be a diminished rational basis for
sustaining the existing statutory structure based on the reliance interests of corporations that held
licenses as of June 1, 1945, when the current exemptions were enacted.

As this Court discussed in its memorandum opinion on Defendants' Motion to Dismiss (Paper No. 19), the exempt corporate licenses under section 7-309(b) are permanent.  Permanent exemptions raise serious equal protection concerns by creating an indefinite classification system that benefits some to the exclusion of all others.  *See Delaware River Basin Com'n v. Bucks County, Etc.*, 641 F.2d 1087, 1098-99 (3d Cir. 1981).  This Court has difficulty finding how a defined class of permanent corporate exemptions in a skilled occupation, such as mortuary science, rationally furthers the public's health and safety.  The licenses are also freely transferable as long as the holder continues to renew it.  In this regard, section 7-309(b) of the Morticians Act is distinguishable from the provisions at issue in *City of New Orleans v. Dukes*, 427 U.S. 297, 303-04 (1976), where the Supreme Court upheld a New Orleans ordinance that generally prohibited pushcart vendors from operating in the French Quarter, but which exempted pushcart vendors who had operated in the Quarter for at least eight years in a grandfather provision.  The exempt pushcart licenses were personal to the existing vendors and consequently limited in duration.  Section 7-309(b) of the Morticians Act is likewise distinguishable from the provisions at issue in *Helton v. Hunt*, 330 F.3d 242, 246-47 (4th Cir. 2003), where the Fourth Circuit held that North Carolina could constitutionally ban the operation of video poker machines brought into the state after June 30, 2000, but not video poker machines brought into the state before that date.  As in *Dukes,* the exemption in *Helton* was not permanent because it applied to individual poker machines, which presumably break down over time.

This Court recognizes the full faith and credit extended to decisions of the Court of Appeals of Maryland.  As set forth in 28 U.S.C. § 1738, the statutory analogue to the Full Faith

and Credit Clause in the United States Constitution,[14] "[t]he . . . judicial proceedings of any court of any such State . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State."  Mindful of this deference to the Court of Appeals' 1963 decision in *Brooks*, this Court need not invalidate sections 7-309(a) and 7-309(b) on the questionable grounds that they still rationally further a legitimate interest under the Due Process and Equal Protection Clauses.  The Maryland ban on corporate ownership on funeral homes, along with the fifty-eight exempt corporate licenses, cannot survive dormant Commerce Clause analysis.

### B.    Dormant Commerce Clause

The Commerce Clause provides that "Congress shall have Power . . . [to] regulate Commerce . . . among the several states."[15]  In addition to this express authorization to Congress, the Commerce Clause has also been interpreted for over 150 years as implicitly embodying a self-excluding limitation on the power of the states to substantially burden interstate commerce, a restriction known as the "dormant Commerce Clause."  *See Cooley v. Bd. of Wardens*, 53 U.S. (12 How.) 299, 317-20 (1852).  The dormant Commerce Clause "limits the power of the States to erect barriers against interstate trade."  *Dennis v. Higgins*, 498 U.S. 439, 446 (1991).  The Framers of our Constitution not only intended that "every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation," but also that "every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any."  *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525,

---

[14] U.S. Const. art. IV, § 1.

[15] U.S. Const. art. I, § 8, cl. 3.

539 (1949).  Thus, the primary objective of the dormant Commerce Clause is to "preserve a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *General Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). The Supreme Court has cautioned, however, that "[i]n the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected." *Lewis v. BT Inv. Mgrs. Inc.*, 447 U.S. 27, 36 (1980) (internal quotations omitted).

In *Yamaha Motor Corp. v. Jim's Motorcycle Inc.*, 401 F.3d 560, 567 (4th Cir. 2005), the Fourth Circuit explained that "[a]nalysis of a dormant Commerce Clause challenge to a state statute proceeds on two tiers, a discrimination tier and an undue burden tier."  A state law that discriminates against interstate commerce facially, in its practical effect or in its purpose is properly reviewed under the first analytical tier. *Wyoming v. Oklahoma*, 502 U.S. 437, 454-55 (1992); *see also Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 785 (4th Cir. 1996).  A discriminatory state law is subject to a *per se* rule of invalidity and will be struck down unless the state establishes "both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means." *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (internal quotations omitted).  Mere economic protectionism alone is never sufficient to sustain a challenged state law under the dormant Commerce Clause. *Wyoming*, 502 U.S. at 454-55.  The second analytical tier, known as the *Pike* balancing tier, applies to a state law if it "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Under the *Pike* balancing tier, the state law will withstand constitutional scrutiny unless the

burdens on commerce are "clearly excessive in relation to the putative local benefits." *Id.*

Plaintiffs' dormant Commerce Clause challenge relates only to sections 7-309(a) and 7-309(b), the provisions that prevent further corporate ownership of funeral homes beyond the fifty-eight available corporate licenses in existence since 1945. Plaintiffs correctly concede that these provisions do not facially discriminate against interstate commerce. Instead, Plaintiffs assert that the two sections of the Morticians Act discriminate in practical effect against interstate commerce and therefore should be struck down under the first tier.[16] Alternatively, they argue that even if the two sections of the Morticians Act do not discriminate against interstate commerce in practical effect, they nonetheless fail the *Pike* balancing test. These arguments will be addressed in turn.

### 1.    Discriminatory Effect of the Morticians Act

A state law is deemed to have a discriminatory effect if it provides for "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 98, 99 (1994). Plaintiffs contend that the Morticians Act "plainly discriminates in practical effect" against interstate commerce because it "permits [fifty-eight] favored domestic corporations to own funeral homes,

---

[16] Plaintiffs mention that the Morticians Act is "arguably discriminatory in purpose." Pls.' Mem. Supp. Summ. J. at 16. In determining whether a given piece of legislation has a discriminatory purpose, "[t]here is, of course, no more persuasive evidence . . . than the words by which the legislature undertook to give expression to its wishes." *Perry v. Commerce Loan Co.*, 383 U.S. 392, 400 (1966). As discussed earlier, the stated purpose of the Morticians Act is to "protect the health and welfare of the public." Md. Code Ann., Health Occ. § 7-103. Both parties readily acknowledge that there is a dearth of direct legislative history and therefore an absence of any readily discernible source that contradicts the Maryland General Assembly's self-serving statement of legislative intent. *Cf. Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d 1252, 1259 n.10 (4th Cir. 1995). In short, there is simply no evidence of discriminatory purpose.

but *categorically forbids* out-of-state corporations from doing so."  Pls.' Mem. Supp. Summ. J. at 26 (emphasis added).  In 1945, the Maryland General Assembly effectively prevented all additional corporations from entering the market except for the Maryland corporations already in existence.  As accurate as Plaintiffs' assertion may have been in 1945 when the provision at issue was enacted, it is plainly no longer the case according to Plaintiffs' own submissions: "At present, licensed morticians own about half of the [fifty-eight] 'grandfather' corporations, while the national chains . . . own the other half."[17]  Pls.' Mem. Supp. Summ. J. at 6-7.

There is no question that the Morticians Act, and especially the provision restricting corporate ownership, is at minimum a protectionist piece of legislation.  The Morticians Act does not, however, "negatively impact interstate commerce to a greater degree than intrastate commerce."  *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 335 (4th Cir. 2001). Plaintiffs' comparison to *West Lynn Creamery v. Healy*, 512 U.S. 186 (1994), is therefore misguided.  In *West Lynn*, the Supreme Court struck down a Massachusetts pricing order that taxed all milk sold in the state and distributed the tax revenue exclusively to in-state milk producers.  *Id*. at 194-96.  Although facially nondiscriminatory, the effect of the pricing order was clearly discriminatory because the exclusive tax revenue distribution to in-state producers placed the tax burden solely on out-of-state producers.  The practical effect of section 7-309(a) of the Morticians Act, however, is to prevent all corporations without an exempt corporate license from owning a funeral home, regardless of whether the corporation is a Maryland one or not.  The Morticians Act regulates evenhandedly by treating in-state and out-of-state interests the

---

[17] Counsel for the parties acknowledged at the hearing on September 10, 2007 that the national chains were required to purchase existing corporate licenses.

same.

Plaintiffs nevertheless rely on *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383 (1994), to support their argument.  In *Carbone,* the Supreme Court invalidated under the dormant Commerce Clause a local flow control ordinance that required all waste entering the town be delivered to a particular processing facility.  *Id*. at 394-95.  The ordinance in *Carbone* was found to be discriminatory even though it covered in-state processors.  *Id*. at 389.  The Supreme Court, however, made it clear that "[i]n this light, the flow control ordinance is just one more instance of local processing requirements that we long have held invalid."  *Id*.  The import of *Carbone* should not be extended beyond the line of cases in which the Supreme Court deliberately placed it.

### 2.       Undue Burden of the Morticians Act

The framework to review the corporate prohibition of the Maryland Morticians Act was delineated in *Pike v. Bruce Church*, 397 U.S. at 142.  Under the *Pike* test, a statute that regulates evenhandedly may nonetheless violate the dormant Commerce Clause if the "burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *Id*. at 142.  The *Pike* test represents a "less strict scrutiny," *Wyoming*, 502 U.S. at 455 n.12, whereby "the extent of the burden that will be tolerated . . . depends on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."  *Pike*, 397 U.S. at 142.  Under the *Pike* test, this Court is required to analyze the putative benefits of the Morticians Act to determine whether the Maryland General Assembly had a "rational basis for believing there was a legitimate purpose that would be advanced by the statute."  *Yamaha*, 401 F.3d at 569.  This Court is reminded by Defendants that "[i]n determining whether a statute has

'a legitimate local purpose' and 'putative local benefits,' a court must proceed with deference to the state legislature." *Id.* While deference to the state legislature is unquestionably required, the Fourth Circuit has been more exacting than Defendants have suggested in their submissions.

For example, the Virginia statute at issue in *Yamaha*, like the Maryland Morticians Act, intended to limit new competition. The statute permitted any existing motorcycle dealer in Virginia to protest the establishment of a new dealership selling the same brand anywhere within the state. *Id.* at 563. Defendants argued that it prevented "market saturation," but the Fourth Circuit reviewed the evidence presented by the parties and found that it was a "serious question" whether the "weak" benefit adduced by the state was legitimate. *Id*. at 571. The court ultimately concluded that there was an "absence of evidence that protection in the form of statewide protest rights for every motorcycle dealer was needed." *Id.* at 573.

Similarly, in *Medigen, Inc. v. Pub. Serv. Comm'n*, 985 F.2d 164, 167 (4th Cir. 1993), the Fourth Circuit affirmatively questioned and ultimately rejected the state's purported benefit, which was "reasonable prices," by examining the record before it. The court explained that "where competition has destructive effects, regulation may be justified . . . . We find *no basis in the record*, however, for concluding that competition in this market has had or will have any destructive effects. Because the 'ruinous' effects of competition are entirely speculative, their prevention cannot justify restricting market entry." *Id*. (emphasis added).

In this case, Defendants argue that the legitimate purpose furthered by the corporate prohibition is consumer protection. *See* Defs.' Mem. Supp. Summ. J. at 32 ("The Maryland General Assembly made the rational determination that the citizens of Maryland would be afforded greater protection if corporations were no longer issued licenses."); Defs.' Resp. at 15

("The Maryland Morticians Act is an exercise of the state's police power in an effort to regulate morticians and protect the citizens of Maryland.").  Defendants offer the deposition of Defendant Hovatter, the President of the State Board of Morticians, who testified that corporations are not accountable or responsive.  Plaintiffs have countered with evidence that Defendant Hovatter never actually studied the matter, nor did anybody else on the State Board of Morticians.  Pls.' Mem. Supp. Summ. J. at 10-11.  Plaintiffs also point to the preceding President, Greg Harthausen, who testified that corporate-owned funeral homes were often more responsive than individually-owned funeral homes to concerns and requests from the State Board.  (Pl. Ex. 9, Harthausen Decl. ¶ 4.)  The selective statements by other members of the State Board of Morticians are also unsupported by any objective criteria.  In fact, Harthausen testified that during his tenure the State Board of Morticians did not have "any evidence that non-mortician ownership of funeral homes would hurt consumers in any way."  (Harthausen Decl. ¶ 4.) Moreover, despite Defendants' claims that funeral homes owned by corporations pose discrete consumer protection concerns, they never acted on these concerns by subjecting the fifty-eight licensed corporations to any additional oversight, nor have they required corporations to disclose their status to potential customers.  *Id.*  Considering the undisputed facts in this case, this Court must conclude that the Defendants' claims of consumer protection concerns appear to be no more than "entirely speculative."  *Medigen*, 985 F.2d at 167.  Instead, Maryland consumers have been negatively affected by the lack of competition resulting from the corporate prohibition. This negative impact is reflected by the inflated cost of funerals in Maryland which well exceed the national average.

Turning to the burden side of the *Pike* ledger, "a closer examination" is required.

27

*Yamaha*, 401 F.3d at 569.  In Maryland, publicly held corporations and national chains own thirty of the fifty-eight corporate licenses, but twenty-eight are owned by privately held Maryland corporations.  Defs.' Mem. Supp. Summ. J. at 12.  Despite these balanced figures, the burden on interstate commerce is still significant in that any person wishing to own a corporate funeral home in Maryland must wait until one of the fifty-eight corporate licenses is for sale.  Once one is placed on the market, the price for the license is inflated.  The market premium placed on a corporate license is not only demonstrated through testimonial evidence, but also through data submitted by the Department of Legislative Services of the Maryland General Assembly.

The *Yamaha* Court found that there was a "chilling effect" on the ability of motorcycle dealerships to expand into Virginia.  *Yamaha*, 401 F.3d at 571.  Plaintiffs have also established that there is a "chilling effect" on corporate expansion of funeral homes into Maryland, as evidenced by data demonstrating that the percentage of corporate funeral homes in Maryland is at least thirty percent lower than the national average.  In *Yamaha*, the motorcycle dealers were forced to "forego [all efforts to] establish new dealers in Virginia," instead "devot[ing] their capital and business expansion efforts in other states."  *Yamaha*, 401 F.3d at 572.  Similarly, Plaintiff Chisholm has been prevented from opening a corporate funeral home in the local market because of the prohibition.  It is quite clear to this Court that the undisputed facts in this case compel the conclusion that the Morticians Act has had a "chilling effect" on the ability of out-of-state corporations to enter the Maryland market.

Not only is the law clearly anti-competitive, but it is also unique.  In *Yamaha*, the Fourth Circuit emphasized that the provision at issue was "uniquely anti-competitive" and that it had

"no parallel in the law of any other state." *Yamaha*, 401 F.3d at 571.  Maryland is joined only by

New Hampshire in prohibiting corporate ownership.  Moreover, Professor Harrington, an expert

in the economics of the funeral industry, testified that in his opinion the corporate prohibition on

funeral homes is the "most blatantly anti-competitive state funeral regulation in the nation."

(Harrington Decl. ¶ 35.)  The reduction in competition also explains the comparatively excessive

cost of a Maryland funeral, which was estimated to be almost $800 more than the national

average.  (*Id*. ¶¶ 20-30.)

In *Yamaha*, the Fourth Circuit found that when there are "few or no adversely affected

in-state interests, *Pike* balancing serves as a check against legislative abuse." *Yamaha*, 401 F.3d

at 569.   The Fourth Circuit also discussed the implications where "in-state interests actively

seek to protect the burdensome law," *id.* at 573, and found that

> [a]lthough those brave enough to try to open new dealerships are
> likely to be Virginia residents, these few individuals are sure to be
> outnumbered and out-gunned by the existing dealers. As a result,
> there is little political check against the possibility of legislative
> abuse in the form of motorcycle franchise laws that unduly burden
> commerce.

*Id*. at 569.  In this case, the in-state interests that have worked to lift ownership restrictions have

undoubtedly been "outnumbered and out-gunned," especially considering that the Task Force to

Examine the State's Cemetery and Funeral Industry concluded over a decade ago that "Maryland

law [should] be changed to allow the issuance of additional corporate licenses for the ownership

and operation of funeral homes."  Final Report of the Task Force, at 22-23.  The Maryland

funeral home industry has benefitted from the "most blatantly anti-competitive state funeral

regulation in the nation," (Harrington Decl. ¶ 35.), and therefore "'has been mollified' by the

economic protection [it] currently enjoy[s]." *Yamaha*, 401 F.3d at 573 (quoting *Clover Leaf*, 449

U.S. at 473 n. 17).  Therefore, just as in *Yamaha*, "there is little political check against the possibility of legislative abuse . . . that unduly burden[s] commerce."  *Id*.

This Court has little difficulty in finding that sections 7-309(a) and 7-309(b) of the Morticians Act, which prohibit corporate ownership of funeral homes in Maryland with indefinite exemptions for corporations holding licenses existing as of June 1, 1945, cannot withstand analysis under the *Pike* test and therefore violates the dormant Commerce Clause.  The burdens of these provisions are considerable.  The corporate prohibition severely limits the ability of out-of-state businesses from opening a funeral home in Maryland.  Even if one of the fifty-eight licenses does become available, a prospective out-of-state purchaser must pay an inflated price for the license.  The undisputed record in this case indicates that these burdens are intolerable and clearly excessive in relation to any benefits proffered by the Defendants.  Consumer protection is obviously a legitimate interest, but Defendants have offered almost no evidence demonstrating that corporate funeral homes pose a discrete risk to the public, and that the corporate prohibition in any way furthers consumer protection.  On the contrary, it is quite clear to this Court that Maryland consumers have been harmed by the corporate prohibition of the Morticians Act by being forced to pay funeral prices well in excess of the national average.

## CONCLUSION

For the reasons stated above, the cross motions for summary judgment by the parties are each GRANTED IN PART and DENIED IN PART.

Plaintiffs' Motion for Summary Judgment seeking declaratory and permanent injunctive relief is GRANTED as to sections 7-309(a) and 7-309(b) of the Maryland Morticians Act, which this Court finds violate the dormant Commerce Clause.  Defendants' Motion for Summary

Judgment is DENIED on this ground.

Defendants' Motion for Summary Judgment is GRANTED as to section 7-310 of the Maryland Morticians Act because this Court finds that the licensing scheme is rationally related to a legitimate state interest and does not violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  Plaintiffs' Motion for Summary Judgment is DENIED on this ground.

A separate Order and Judgment follows.

/s/

Richard D. Bennett
United States District Judge

Date: October 17, 2007